WILLIAM F. SULLIVAN (SB# 78353)
williamsullivan@paulhastings.com
HOWARD M. PRIVETTE (SB# 137216)
howardprivette@paulhastings.com
D. SCOTT CARLTON (SB# 239151)
scottcarlton@paulhastings.com
SARAH KELLY-KILGORE (SB# 284571)
sarahkellykilgore@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA  90071-2228
Telephone:  1(213) 683-6000
Facsimile:  1(213) 627-0705

Attorneys for Defendants
SFX ENTERTAINMENT, INC. and ROBERT
F.X. SILLERMAN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| PAOLO MORENO, an individual; LAWRENCE VAVRA, an individual; and GABRIEL MORENO, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> SFX ENTERTAINMENT, INC., a Delaware Corporation; ROBERT F.X. SILLERMAN, an individual; SHELDON FINKEL, an individual, <br><br> Defendants. | Case No. CV-14-0880-RSWL-CWx <br><br> Hon. Ronald S.W. Lew <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Hearing Date:  May 26, 2015 <br> Time:  10:00 AM <br> Location:  Courtroom 21 <br><br> Trial Date:  July 21, 2015 <br> Complaint Filed:  February 5, 2014 <br><br> [Notice of Motion and Motion for Summary Judgment, [Proposed] Statement of Uncontroverted Facts, Declarations and Exhibits attached thereto, and [Proposed] Judgment filed and served concurrently herewith] |

# TABLE OF CONTENTS

Page

I.   PRELIMINARY STATEMENT ...................................................................1

II.  STATEMENT OF UNDISPUTED FACTS.................................................2

    A.   Robert F.X. Sillerman and the Business of Live Entertainment...........2

    B.   In 2011, Mr. Sillerman Founded an Entertainment Company
        Focused on the Burgeoning EDM Industry and Was Exploring
        Opportunities for Growth .....................................................................3

    C.   In January 2012, Mr. Sillerman Met with a Number of
        Individuals Regarding Specific Business Opportunities in the
        EDM Industry .....................................................................................3

    D.   Between January 6 and 8, 2012, Mr. Sillerman and Paolo
        Exchanged "Proposed Terms" for Offers of Employment at SFX .......4

    E.   Plaintiffs Continued Negotiating the Terms of Their Potential
        Employment Offers for More Than a Year After January 8, 2012.......6

    F.   Plaintiffs Received and Indicated That They Understood All
        Relevant Information Regarding the Proposed Distribution of
        Founders' Shares ...............................................................................10

    G.   Throughout 2012, Plaintiffs Continued to Shop Their Services to
        SFX's Competitors, and Received Commissions from Non-
        Parties for Services That Harmed Mr. Sillerman and the
        Company.............................................................................................11

    H.   Plaintiffs Failed to Perform Services for SFX's Benefit....................13

III. STANDARD FOR SUMMARY JUDGMENT ...........................................14

IV.  SUMMARY JUDGMENT SHOULD BE GRANTED AS TO THE
    JOINT VENTURE/PARTNERSHIP CLAIMS BECAUSE THERE
    WAS NO FORMATION OF ANY JOINT
    VENTURE/PARTNERSHIP AGREEMENT (CLAIMS 1-4)....................15

    A.   The Parties Failed to Create a Joint Venture/Partnership by
        Express Agreement Because They Had Not Reached Any
        Binding Agreement by January 8, 2012..............................................16

        i.   The Alleged Agreement Was Not Binding Because a
            Number of Open and Unresolved Terms Rendered It
            Fatally Uncertain and the Parties Manifested an Intent Not
            to Be Bound.............................................................................16

**TABLE OF CONTENTS**
(continued)

Page

      ii.    The Parties' Proposed Terms Are Insufficient to Create a Joint Venture/Partnership..........................................................20

   B.   The Parties' Course of Conduct Was Insufficient to Establish a Joint Venture/Partnership Because They Never Shared Profits, Joint Control, or Ownership of the Proposed Enterprise, and Plaintiffs Held Themselves Out as Being Independent of SFX..........24

   C.   Plaintiffs' Breach of Fiduciary Duty and Constructive Fraud Claims Must Be Dismissed Because Defendants Owed No Fiduciary Duties in the Absence of a Joint Venture/Partnership........26

V.   PLAINTIFFS' CONTRACT AND QUASI-CONTRACT CLAIMS FAIL BECAUSE THERE WAS NO FORMATION OF ANY BINDING AGREEMENT AND PLAINTIFFS CANNOT PROVE ANY PERFORMANCE OR REASONABLE RELIANCE (CLAIMS FOR RELIEF 5-7, 11) ...............................................................26

   A.   Plaintiffs' Contract Claims Fail Because the Parties' Ongoing Negotiations Never Resulted in Any Binding and Enforceable Contract ..............................................................................27

   B.   Plaintiffs' Quasi-Contract Claims Fail Because Plaintiffs Never Performed Services for Defendants' Benefit and Certainly Did Not Do So in Reliance on Any Agreement or Promise .....................29

VI.   SUMMARY JUDGMENT SHOULD BE GRANTED AS TO PLAINTIFFS' FRAUD-BASED CLAIMS BECAUSE THERE IS NO EVIDENCE OF FRAUDULENT INTENT OR REASONABLE RELIANCE (CLAIMS FOR RELIEF 8-9)...................................31

   A.   Plaintiffs' Fraud-Based Claims Fail as a Matter of Law Because There Is No Evidence That Any Misrepresentation Was Made with Fraudulent Intent ........................................................32

   B.   Plaintiffs' Fraud-Based Claims Fail As a Matter of Law Because Plaintiffs Cannot Establish Any Justifiable Reliance..........................33

VII.   PLAINTIFFS' UNFAIR COMPETITION CLAIM FAILS AS A MATTER OF LAW BECAUSE THEIR CASE INVOLVES A PRIVATE, CONTRACT-BASED MATTER (CLAIM FOR RELIEF 10) ..................................................................................34

VIII.  CONCLUSION..................................................................35

MEM. OF P. & A. IN SUPP. OF
DEFS.' MOT. FOR SUMM. J.

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*United States ex rel. Anderson v. N. Telecom, Inc.*,
  52 F.3d 810 (9th Cir. 1995) ...................................................................15

*Beck v. Am. Health Grp. Int'l, Inc.*,
  211 Cal. App. 3d 1555 (1989) ..............................................................18

*Beckwith v. Dahl*,
  205 Cal. App. 4th 1039 (2012) .............................................................32

*Bell v. Fed. Home Loan Mortg. Corp.*,
  2012 WL 4576584 (S.D. Cal. Oct. 1, 2012) .........................................31

*Belton v. Comcast Cable Holdings, LLC*,
  151 Cal. App. 4th 1224 (2007) .............................................................35

*Benicorp Ins. v. National Med. Health Card Sys., Inc.*,
  447 F. Supp. 2d 329 (S.D.N.Y. 2006) ..................................................27

*Brown v. Cara*,
  420 F.3d 148 (2d Cir. 2005)............................................................ *passim*

*Building Permit Consultants, Inc. v. Mazur*,
  122 Cal. App. 4th 1400 (2004) .............................................................32

*Bustamante v. Intuit, Inc.*,
  141 Cal. App. 4th 199 (2006) ........................................... 16, 17, 22, 29

*Cedars Sinai Med. Ctr. v. Mid-W. National Life Ins.*,
  118 F. Supp. 2d 1002 (C.D. Cal. 2000) ...........................................29, 31

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...............................................................................14

*Costco Wholesale Corp. v. Liberty Mut. Ins.*,
  472 F. Supp. 2d 1183 (S.D. Cal. 2007)..................................................14

*In re Dewey & LeBoeuf LLP*,
  518 B.R. 766 (S.D.N.Y. 2014)..............................................................22

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Express, LLC v. Fetish Grp., Inc.,*
464 F. Supp. 2d 965 (C.D. Cal. 2006) ...................................................35

*Fredianelli v. Jenkins,*
931 F. Supp. 2d 1001 (N.D. Cal. 2013) .......................................20, 23

*Frontier-Kemper Constr'rs, Inc. v. Am. Rock Salt Co.,*
224 F. Supp. 2d 520 (W.D.N.Y. 2002) ...............................................32

*Goodworth Holdings Inc. v. Suh,*
239 F. Supp. 2d 947 (N.D. Cal. 2002) .............................. 16, 17, 26

*Gregory v. Albertson's, Inc.,*
104 Cal. App. 4th 845 (2002) ..............................................................34

*Heck v. Voelkle,*
160 N.Y.S. 903 (1916) .............................................................................20

*Holmes v. Lerner,*
74 Cal. App. 4th 442 (1999) .......................................................21, 24

*Jacobsen v. Marin Gen. Hosp.,*
192 F.3d 881 (9th Cir. 1999) ................................................................23

*Kidz Cloz, Inc. v. Officially For Kids, Inc.,*
320 F. Supp. 2d 164 (S.D.N.Y. 2004) ...................... 15, 21, 24, 26

*Langer v. Dadabhoy,*
843 N.Y.S.2d 262 (N.Y. App. Div. 2007) ..............................18, 29

*Lazar v. Superior Court (Rykoff-Sexton, Inc.),*
12 Cal. 4th 631 (1996) ......................................................................31, 32

*In re Lona,*
393 B.R. 1 (N.D. Cal. 2008) ..................................................................20

*Louis Lesser Enters., Ltd. v. Roeder,*
209 Cal. App. 2d 401 (1962) ................................................................20

*Marquart v. Smith,*
2014 WL 1990286 (Cal. Ct. App. May 16, 2014).........................22

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*MatlinPatterson ATA Holdings LLC v. Fed. Express Corp.*,
  929 N.Y.S.2d 571 (N.Y. App. Div. 2011) ....................................29, 30

*MBIA Ins. v. Credit Suisse Sec. (USA) LLC*,
  927 N.Y.S.2d 517 (N.Y. Sup. Ct. 2011) .............................................32

*McElroy v. Gemark Alloy Refining Corp.*,
  592 F. Supp. 2d 508 (S.D.N.Y. 2008) ................................................24

*Myrick v. Mastagni*,
  185 Cal. App. 4th 1082 (2010) ...........................................................15

*Oakland Raiders v. National Football League*,
  131 Cal. App. 4th 621 (2005) ......................................................22, 24

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) ..............................................................14

*Pac. Bus. Cap. Corp. v. Globex Brands, Inc.*,
  2011 WL 66337 (C.D. Cal. Jan. 7, 2011) .....................................32, 34

*Precision Testing Labs., Ltd. v. Kenyon Corp. of Am.*,
  644 F. Supp. 1327 (S.D.N.Y. 1986) ...................................................17

*Prospect Street Ventures I, LLC v. Eclipsys Solutions Corp.*,
  804 N.Y.S.2d 301 (N.Y. App. Div. 2005) ..........................................30

*Prudential Home Mortg. Co. v. Superior Court (Centerbank
  Mortg. Co.)*, 66 Cal. App. 4th 1236 (1998) .......................................35

*Pulver Roofing Co. v. SBLM Architects, P.C.*,
  884 N.Y.S.2d 802 (N.Y. App. Div. 2009) ..........................................30

*S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*,
  72 Cal. App. 4th 861 (1999) .........................................................34, 35

*Scholastic, Inc. v. Harris*,
  259 F.3d 73 (2d Cir. 2001)...........................................................15, 26

*Serv. by Medallion, Inc. v. Clorox Co.*,
  44 Cal. App. 4th 1807 (1996) .............................................................32

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Shroyer v. New Cingular Wireless Servs., Inc.,*
    622 F.3d 1035 (9th Cir. 2010) ............................................................35

*Siegel v. Warner Bros. Entm't Inc.,*
    542 F. Supp. 2d 1098 (C.D. Cal. 2009) .................................... 27, 28, 29

*Simons v. Ross,*
    765 N.Y.S.2d 859 (N.Y. Sup. Ct. 2003) ................................................26

*Sole Energy Co. v. Petrominerals Corp.,*
    128 Cal. App. 4th 212 (2005) ..............................................................23

*Stratavest v. Rogers,*
    888 F. Supp. 35 (S.D.N.Y. 1995) .....................................................24, 25

*Stull v. Fox,*
    2010 WL 3895538 (C.D. Cal. Oct. 4, 2010)..........................................15

*US Ecology, Inc. v. State,*
    129 Cal. App. 4th 887 (2005) ..............................................................29

*Yonofsky v. Wernick,*
    362 F. Supp. 1005 (S.D.N.Y. 1973) ......................................................16

*Zeibak v. Nasser,*
    12 Cal. 2d 1 (1938) ............................................................................26

**STATUTES**

Cal. Bus. and Prof. Code § 17200.............................................2, 34, 35

Cal. Corp. Code
    § 16401.........................................................................................22
    § 16801.........................................................................................26

N.Y. P'ship Law § 40.........................................................................22

**OTHER AUTHORITIES**

59A Am. Jur. 2d *Partnership* § 137.....................................................20

16 N.Y. Jur. 2d *Business Relationships* § 2129 ....................................26

# TABLE OF AUTHORITIES
## (continued)

Page(s)

Banks, Glen, 28 N.Y. Prac., *Contract Law* § 4:23 (2014)........................................30

Fed. R. Civ. P. 56 ........................................................................................................14

Stern, William L., *Bus & Prof. Code. § 17200 Practice* § 5:239 (The
    Rutter Group 2004)................................................................................................35

## I.   PRELIMINARY STATEMENT

This lawsuit arises from a breakdown in the parties' negotiations over Plaintiffs' potential employment with defendant SFX Entertainment, Inc. ("SFX" or the "Company").  Throughout the course of those negotiations, the parties maintained that none of the proposed terms would become binding unless a formal written agreement was executed.  ***The parties never executed any agreement.***  And discovery has since revealed that while engaging in negotiations with defendant Robert F.X. Sillerman and SFX, Plaintiffs continuously worked to advance their own interests at Defendants' expense, actively shopping the parties' contemplated acquisition targets to SFX's competitors, providing competitors with confidential information about SFX and its acquisition strategies, and demanding commissions from the acquisition targets as compensation for driving purchase prices higher.

Ignoring all of this, Plaintiffs now claim that the potential employment terms proposed in January 2012 somehow created not just a binding agreement, but a binding joint venture/partnership agreement.  There is simply no evidence supporting these claims.  At no point did the parties reach any meeting of the minds as to Plaintiffs' potential employment, failing to agree on material terms as basic as how much time Plaintiffs would devote to the Company.  The undisputed evidence shows that Plaintiffs could not even reach an accord amongst themselves as to the terms of the alleged agreement.  In fact, Gabriel Moreno ("Gabe") has admitted that he never even knew of the proposed terms, and stated in May 2013—prior to the filing of this lawsuit—that his brother, Paolo Moreno ("Paolo"), had never had authority to enter into any agreement on Gabe's behalf.  Moreover, at no point during the parties' lengthy exchange did Plaintiffs seek to change the draft employment offer letters and draft employment agreements being negotiated into any agreement for a joint venture/partnership.  And at no point did Plaintiffs negotiate a division of profits and losses with Mr. Sillerman, take on any financial risks or losses in connection with SFX's business, or exhibit any control over or

1    management of SFX.  As such, Plaintiffs have no basis on which they can prove the

2    existence of any binding agreement, much less one that would have created a joint

3    venture/partnership.

4         Plaintiffs' attempts to convert their employment claims into fraud are equally

5    unavailing.  Plaintiffs contend that they were fraudulently induced into the alleged

6    agreement and gave up other business opportunities in reliance upon promises that

7    Mr. Sillerman would perform the terms of the alleged agreement.  However,

8    fraudulent inducement and promissory fraud require proof of more than claims of

9    unkept promise or mere failure of performance; they require proof of intent to

10   defraud at the time the promise was made.  Plaintiffs can show no such intent on

11   Mr. Sillerman's part because the evidence clearly shows that he provided Plaintiffs

12   with proposed employment offer letters and agreements that were consistent with

13   the terms of the alleged agreement.  Plaintiffs' failure to accept these terms and to

14   perform in no way proves fraudulent intent on Mr. Sillerman's part but is evidence

15   only of Plaintiffs' wrongful conduct, including double-dealing and active deceit.

16       Finally, because Plaintiffs cannot present any evidence that Mr. Sillerman or

17   SFX engaged in any unfair or unlawful business practice, their claim for relief

18   under section 17200 of California's Business and Professions Code ("UCL") fails.

19       Defendants therefore respectfully request that the Court grant summary

20   judgment as to each and every one of Plaintiffs' claims for relief.

21   **II.    STATEMENT OF UNDISPUTED FACTS**

22       **A.    Robert F.X. Sillerman and the Business of Live Entertainment.**

23       Robert F.X. Sillerman has long occupied a prominent role in the business of

24   live entertainment.  In 1997, Mr. Sillerman founded the original "SFX

25   Entertainment," a company which grew under Mr. Sillerman's leadership to

26   become the world's largest producer, promoter, and presenter of live entertainment,

27   now known as Live Nation Entertainment.  (Uncontroverted Fact ("UF") 4.)

28   Mr. Sillerman's aptitude for identifying emerging trends in the entertainment

MEM. OF P. & A. IN SUPP. OF
DEFS.' MOT. FOR SUMM. J.

industry is unquestioned.  In addition to pioneering the original SFX Entertainment, Mr. Sillerman has played a major role in founding and leading a number of other entertainment companies, including Circle Entertainment, Inc.; CKX, Inc.; and Viggle, Inc.[1]  (UF 2-5.)

**B.      In 2011, Mr. Sillerman Founded an Entertainment Company Focused on the Burgeoning EDM Industry and Was Exploring Opportunities for Growth.**

In 2011, Mr. Sillerman reentered the entertainment business with his long-time business associate, Mitchell Slater, who had previously served as Executive Vice President and Chief Operating Officer of the original "SFX Entertainment." (UF 20.)  Mr. Sillerman founded the business that year, filing a certificate of incorporation for the entertainment company in Delaware on July 7, 2011.  (UF 21.) Together, he and Mr. Slater began investigating attractive business opportunities in the burgeoning EDM industry and exploring potential acquisitions.  (UF 23.)  In fact, in 2011, Messrs. Sillerman and Slater attempted to acquire Prospect Park, a company with strong EDM connections.  (*Id.*)  After investigating other opportunities, in late December 2011, Mr. Slater informed Mr. Sillerman that Sheldon Finkel, another long-time business associate of Messrs. Sillerman and Slater, had reached out to discuss the EDM "space."  (UF 33.)

**C.      In January 2012, Mr. Sillerman Met with a Number of Individuals Regarding Specific Business Opportunities in the EDM Industry.**

Having previously acquired one of Mr. Finkel's companies through the original "SFX Entertainment," Mr. Sillerman knew Mr. Finkel to be a "legend" in the entertainment industry, and agreed to meet with him on or about January 2, 2012.  (UF 35.)  At this meeting, Messrs. Finkel and Sillerman discussed both general ideas for generating revenue from EDM music festivals and the possibility

---

[1] The extensive experience of Mr. Sillerman and his business associates, Sheldon Finkel, Mitchell Slater, and Mitchell Nelson in the entertainment industry is more fully described in the declarations filed concurrently herewith.

-3-

1    of acquiring—through SFX—a number of these festivals and/or promoters,

2    including Disco Donnie Presents ("Disco Donnie") and Dayglow.  (UF 36-38.)

3    Mr. Finkel proposed that Mr. Sillerman meet Paolo, whom Mr. Finkel believed to

4    have a substantial connection to a couple of leading promoters in the EDM

5    industry.  (UF 39.)  At no point during the January 2, 2012 meeting did Mr. Finkel

6    represent that he was proposing a legal "partnership" or "joint venture" with

7    Mr. Sillerman.  Rather, Messrs. Sillerman and Finkel discussed—and both

8    understood that any deal would result in, at most—offers of employment for Mr.

9    Finkel and Paolo, along with some limited equity consistent with that of other

10   employees.  (*Id.*)

11          On or about January 5, 2012, Mr. Sillerman met with, among others, Paolo

12   and Messrs. Finkel and Slater in New York City.  (UF 40.)  At this meeting, Paolo

13   represented that he would use his self-described strong connections in the EDM

14   industry to facilitate SFX's acquisition of certain businesses within the industry that

15   Mr. Finkel had identified as potential targets for a rollup.  (*Id.*)  Specifically, Paolo

16   stressed his connection with Pasquale Rotella, the founder of Insomniac, Inc.

17   ("Insomniac") and the Electric Daisy Carnival, a prominent EDM company and

18   festival, respectively.  (*Id.*)  As was true at the January 2 meeting, none of the

19   attendees at the January 5 meeting proposed that any legal "partnership" or "joint

20   venture" be created with Mr. Sillerman.  (UF 42, 46.)

21          **D.    Between January 6 and 8, 2012, Mr. Sillerman and Paolo**
             **Exchanged "Proposed Terms" for Offers of Employment at SFX.**
22

23          On January 6, 2012, Paolo sent the first of many emails to Mr. Sillerman

24   regarding the potential terms of a proposed employment agreement between Paolo

25   and SFX.  Over the course of subsequent emails between January 6 and January 8

26   (hereinafter, the "January 8 email exchange"), Paolo and Mr. Sillerman discussed

27   potential terms of employment for Paolo and Gabe, as well for Lawrence Vavra.

28   (UF 49-56, 58-66.)  Twice, Mr. Sillerman believed the parties may have been

-4-

MEM. OF P. & A. IN SUPP. OF
DEFS.' MOT. FOR SUMM. J.

1    nearing an agreement, and suggested that their respective counsel review the

2    proposed terms and negotiate a formal written agreement. (UF 62, 64.)

3    Specifically, on January 7, Mr. Sillerman stated, "Deal. . . . Send me a quick

4    summary to make sure we're on the same page. . . . Once I receive and confirm the

5    recap the lawyers will be on it." (UF 62.) A day later, in response to another of

6    Paolo's changes to the proposal, Mr. Sillerman stated, "We have a deal. . . . Let's

7    get the lawyers working." (UF 64.) However, in what would later be revealed as

8    Plaintiffs' *modus operandi*, Paolo continually renegotiated the terms proposed

9    during these email conversations in subsequent communications. (*E.g.*, UF 74, 86.)

10        Even Plaintiffs' counsel at the time understood that the parties had not

11    definitively settled any terms for Plaintiffs' potential employment. (UF 66.) In the

12    final email on January 8, Salvador P. LaVina, an attorney representing Plaintiffs,

13    referred to the parties' correspondence as comprising "proposed terms" and stated

14    that he would review the proposals and draft a letter of intent. (*Id.*) Consistent with

15    Attorney LaVina's belief, Mr. Sillerman understood the terms of employment

16    proposed in the January 8 email exchange to be subject to further discussions

17    between the parties' lawyers and not be binding until the parties executed a formal

18    written employment agreement. (UF 69.)

19        At no point during this email exchange was a legal partnership or joint

20    venture discussed, much less formed. (UF 70.)

21        During the January 8 email exchange, Paolo also made multiple

22    representations which, at the time, Mr. Sillerman had no reason to believe were

23    inaccurate or untruthful. First, Paolo underscored his deep personal commitment to

24    working for SFX, telling Mr. Sillerman: "I will be giving up everything in front of

25    me and this will be my sole project 24/7/365 . . . ." (UF 55.) Paolo likewise

26    represented that his team, including Gabe, Vavra, and James "Disco Donnie"

27    Estopinal (the founder of Disco Donnie), "will all be walking away from [their]

28    current situations and coming on board 24/7 . . . ." (*Id.*)

-5-

1    Second, Paolo conveyed an ability and desire to act on behalf of SFX and to

2    quickly close deals with two acquisition targets that had been discussed by

3    Messrs. Sillerman and Finkel.  Paolo again emphasized his personal connection to

4    Mr. Rotella, the founder of Insomniac and Electric Daisy Carnival, telling

5    Mr. Sillerman, "Electric Daisy Carnival is a deal I would like for us to cut next

6    week." (UF 50.)  Paolo represented that his connection to Mr. Rotella and his

7    companies was purportedly maintained through Paolo's brother, Gabe.  (*Id.*)  Paolo

8    likewise professed an ability to expeditiously close a deal between SFX and Disco

9    Donnie.  After representing that Mr. Estopinal was a member of Paolo's "team" on

10   January 6, Paolo told Mr. Sillerman on January 7:  "I have the first acquisition

11   ready to go DD." (UF 61.)

12      Ultimately, Paolo grossly exaggerated the strength of his connections and

13   acumen in the EDM industry.  In fact, after his meetings with Mr. Sillerman, Paolo

14   admitted that he "knew nothing about the music business before this, and zero

15   about dance music… ." (UF 16, 41.)  Moreover, Paolo credits Mr. Finkel with

16   "educat[ing]" him on dance music generally and on the specific concept of

17   executing a business consolidation or rollup.  (UF 24.)  Had Paolo accurately

18   disclosed his experience in the industry, it is unlikely that Mr. Sillerman and/or

19   SFX would have offered him employment.  (UF 41.)[2]

20   **E.    Plaintiffs Continued Negotiating the Terms of Their Potential**
         **Employment Offers for More Than a Year After January 8, 2012.**
21

22      Although Plaintiffs contend that the alleged agreement was finalized as of

23   January 8, 2012, Paolo, claiming to act on behalf of all Plaintiffs, continued to

24   negotiate the proposed terms of their potential employment with SFX after that

25

26   _____
     [2] Paolo also intentionally concealed both his felony conviction related to trafficking
27   narcotics and his multi-million-dollar tax debt (evidenced by federal tax liens),
     knowing that he would not have been offered employment had he revealed these
28   facts.  (UF 43-44.)

                                          MEM. OF P. & A. IN SUPP. OF
                                          DEFS.' MOT. FOR SUMM. J.

1    date. (*E.g.*, UF 74, 86, 92.)  In fact, on January 9, just one day after Plaintiffs claim

2    the alleged agreements became final, Paolo attempted to renegotiate material terms

3    of his proposed employment, writing Mr. Sillerman:

4          I know you seemed firm in your negotiations of salaries.  This will be

5          my sole source of income and I do not want to have any distractions

6          or pressures from anything else as I do this.  ***A salary of 300k for a***

7          ***father of 3 that supports his family when all is said and done is just***

8          ***too little[;] I really need this to be 500k.***

9    (UF 74 (emphasis added).)

10         Paolo continued to negotiate and modify the proposed terms of Plaintiffs'

11   potential employment throughout the next month, even after receiving a draft

12   employment offer letter from SFX's Senior Legal Advisor, Mitchell J. Nelson,

13   which contained the same proposed terms of salary, stock options, and bonuses as

14   the January 8 email exchange. (*E.g.*, UF 86, 92.)  Mr. Nelson provided this draft

15   employment offer letter on January 16, which included statements that "a more

16   formal employment agreement" would need to be prepared and that no offer would

17   be formalized until "[Plaintiffs] grant [SFX] the authorization to complete standard

18   background checks and review your references." (UF 79.)  At the same time, Mr.

19   Nelson informed Paolo that he would discuss any potential award of founders'

20   shares with Plaintiffs' counsel. (*Id.*)

21         A few days later, on January 19, Attorney LaVina sent his first volley in what

22   would become a protracted negotiation over the terms of Plaintiffs' potential

23   employment.  Attorney LaVina proposed a number of revisions to the initial draft

24   employment offer letter and stated: "Once we've agreed to the form of the Paolo

25   Moreno term sheet, we can replicate it for the Lawrence Vavra and Gabriel Moreno

26   employment agreements." (UF 86.)  Among the proposed material revisions,

27   Attorney LaVina added a non-discretionary bonus pegged to a percentage of the

28   "transaction value" of each acquisition in excess of $1 million, and added a

MEM. OF P. & A. IN SUPP. OF
DEFS.' MOT. FOR SUMM. J.

1   corporate apartment in New York City. (*Id.*) Plaintiffs' addition of the non-
2   discretionary bonus is significant because that material term had been discussed in
3   the January 8 email exchange and rejected by Mr. Sillerman due to the possibility
4   of creating "mis-aligned interest[s]." (UF 60.) Attorney LaVina did not alter the
5   provisions requiring a more formal agreement and background checks, which
6   would have revealed Paolo's prior felony conviction for narcotics trafficking.
7   (UF 86.) Neither the proposed revisions nor Attorney LaVina's cover email
8   mentioned a joint venture/partnership with Mr. Sillerman. (*Id.*)

9         On January 25, 2012, Mr. Nelson provided a revised version of Paolo's draft
10   employment offer letter. (UF 91.) This version removed the non-discretionary
11   bonus and New York City apartment that had been inserted by Plaintiffs on
12   January 19. (*Id.*) Mr. Nelson noted, once again, that he and Attorney LaVina
13   needed to discuss founders' shares. (*Id.*) Neither the revised version of Paolo's
14   offer letter nor Mr. Nelson's communication mentioned a joint venture/partnership
15   involving Mr. Sillerman and/or SFX. (*Id.*) Paolo responded the same day, stating
16   that he wanted to renegotiate the proposed allocation of founders' shares and
17   salaries amongst Plaintiffs, which had remained the same since the January 8 email
18   exchange. (UF 92.)

19         Thereafter, Plaintiffs continued to negotiate the terms of their potential
20   employment offers, both collectively and on individual bases. Despite providing no
21   further response to the January 25, 2012 revised draft employment offer letter,
22   Paolo told Mr. Sillerman on February 1 that he needed "to get employment
23   agreements executed and secured right away for [Mr. Estopinal], Gabriel Moreno,
24   and [him]self." (UF 101.) Paolo suggested "cut[ting]" Vavra's employment offer
25   because he had "misaligned interests." (UF 102.) Mr. Nelson followed up with
26   Attorney LaVina regarding the status of the proposed terms of Plaintiff's potential
27   employment on February 2, but received no response. (UF 103.) At no time did
28   Plaintiffs sign the proposed offer letters. (UF 87, 137, 139.)

1    Two months later, on April 10, 2012, Attorney LaVina informed Mr. Nelson
2  that Paolo would soon provide "comments" on a proposed employment agreement.
3  (UF 118.)  Nearly two weeks later, Attorney LaVina finally provided a revised draft
4  of an employment agreement for Paolo. (UF 119.)  That revised draft included a
5  number of substantial and material changes to the proposed terms of Paolo's
6  potential employment.  Specifically, the revised draft inserted language providing
7  Paolo with a broad license to work on businesses unrelated to SFX, which
8  contradicted Paolo's initial promise to work "24/7/365" for SFX.  (Id.)[3]  The
9  revisions also provided that Paolo's employment at SFX would be "non-exclusive"
10 and that "cause" for termination include not all felony convictions, but rather only
11 those occurring during the term of the agreement.  (Id.)  Noticeably absent from the
12 many revisions is any reference to a joint venture/partnership.  (Id.)

13    Negotiations over Plaintiffs' draft employment agreements continued
14 throughout the summer and fall of 2012.  (UF 120.)  At no point, however, did
15 Plaintiffs sign any of the proposed employment agreements or inquire as to why the
16 agreements did not mention a joint venture/partnership.  (UF 141, 161-62.)  In
17 2013, Vavra began personally negotiating the proposed terms of his potential
18 employment with SFX.  (UF 158.)  During those negotiations, Vavra expressed
19 concern that any "full time" employment with SFX might interfere with his
20 ongoing work managing personnel and EDM artists at his company, Deckstar. (Id.)
21 Vavra proposed changing the proposed terms of his potential employment with
22 SFX, stating that he would agree to spend just 50% of his time working for the
23 Company.  (Id.)  At approximately the same time, Paolo also stated his intent to
24 spend limited time working for SFX, another gross departure from the original
25 promise that he and his team would work for SFX "24/7."  (UF 160.)  At no point,

---

[3] As described in further detail below, these suggested changes underscore the fact
that Plaintiffs continued to work on non-SFX matters throughout 2012. (E.g., UF
76-78, 80-85, 89-90, 96-100, 143.)

-9-

1    however, did Plaintiffs mention anything about a joint venture/partnership with

2    Defendants.  (UF 162.)

3            Subsequent to these further negotiations, in April 2013, SFX circulated draft

4    agreements (in the form of consulting contracts), with the hope that Plaintiffs had

5    finally completed their negotiations and were ready to finalize and sign agreements

6    with the Company.  (UF 161.)  In May 2013, Gabe emailed Paolo to clarify that

7    Paolo did not have authority to negotiate with SFX on Gabe's behalf.  (UF 165.)

8    Gabe specifically stated: "You are not authorized to accept any deal from sfx

9    without my permission as you thought you could do with the original deals without

10   my knowledge or consent to what the deals were." (*Id.*)

11           Although Mr. Finkel executed finalized agreements with SFX and became an

12   employee, Plaintiffs' proposed agreements remain unsigned.  (UF 46, 141, 161.)

13   **F.    Plaintiffs Received and Indicated That They Understood All**
**        Relevant Information Regarding the Proposed Distribution of**
14   **        Founders' Shares.**

15           At numerous points throughout 2012, Mr. Nelson prompted Attorney LaVina

16   to engage in a discussion about founders' shares generally and about the specific

17   awards proposed for Plaintiffs.  (UF 93.)  On both January 16 and January 25, Mr.

18   Nelson informed Plaintiffs that he needed to speak with their counsel about

19   founders' shares.  (UF 79, 91.)  In subsequent discussions of the topic, Mr. Nelson

20   explained to Attorney LaVina that SFX was in the process of determining the total

21   number of outstanding shares available for distribution.  (UF 93.)  Mr. Nelson

22   further explained that, for tax purposes, documentation of any proposed award of

23   founders' shares to Plaintiffs would be distinct from their proposed employment

24   agreements.  (*Id.*)  At all times, Attorney LaVina conveyed that he understood the

25   nature of founders' shares and the issues related to documentation.  (UF 94.)  This

26   is reflected in an email exchange between Attorney LaVina and Vavra on January

27   27, 2012, in which Vavra asked, "Did you and Mitchell Nelson figure out the

28   founders shares issue?  Are we good to go?" and Attorney LaVina replied

-10-

1    "Founder's shares and deal structure issues resolved." (UF 95.)

2        In addition to the discussions between counsel, Mr. Sillerman and Paolo met

3    in the spring of 2012 to discuss the founders' shares. (UF 123.) Mr. Sillerman

4    explained that, due to an investment by Och-Ziff Capital Investments LLC, there

5    would be only 36,000,000 outstanding founders' shares in SFX, rather than the

6    100,000,000 contemplated in January 2012. (*Id.*) Mr. Sillerman used the concept

7    of a "reverse stock split" as an analogy in order to convey to Paolo, who describes

8    himself as unsophisticated in matters of finance, that there had been a proportional

9    reduction in all investors' and employees' ownership of founders' shares. (*Id.* ) On

10    May 31, 2012, Mr. Sillerman emailed Paolo to confirm that Plaintiffs would be

11    receiving documentation of the allocation of founders' shares. (UF 125.)

12        A few days later, Attorney LaVina received Subscription Agreements and

13    Promissory Notes offering Paolo, Gabe, and Vavra 360,000; 72,000; and 72,000

14    shares, respectively. (UF 124.) In an apparent reference to these Subscription

15    Agreements, Paolo Moreno emailed Mr. Sillerman on June 5, 2012 stating: "My

16    lawyers got the package! YEEHAW!" (UF 125.) On multiple occasions

17    thereafter, SFX sent Plaintiffs nominee agreements offering the same number of

18    founders' shares as were offered under the subscription agreements, and followed

19    up with Attorney LaVina to request that Plaintiffs execute the proposed agreements.

20    (UF 138-39.) Ultimately, the agreements remain unsigned. (UF 137, 139.)

21        **G.**    **Throughout 2012, Plaintiffs Continued to Shop Their Services to**

22                **SFX's Competitors, and Received Commissions from Non-Parties for Services That Harmed Mr. Sillerman and the Company.**

23        Plaintiffs represented and Mr. Sillerman understood that Plaintiffs would be

24    working "24/7/365" for SFX to execute a rollup of the EDM space, beginning with

25    the acquisitions of Disco Donnie and Insomniac. (UF 55.) Accordingly, Mr.

26    Sillerman instructed them to "discontinue any negotiations with other interested

27    investors." (Cmpl. at ¶ 20.) Plaintiffs ignored this instruction, continuing to test

28    the market in hopes of finding a better deal than that allegedly reached with

1  Mr. Sillerman on January 8. (UF 77-78, 80-83, 85, 87.) Plaintiffs not only shopped

2  the parties' potential acquisition targets to competing investors (using confidential

3  information to do so), but also negotiated with potential acquisition targets to obtain

4  commissions for themselves—commissions that only grew larger as Plaintiffs

5  created bidding wars between SFX and its competitors. (UF 84, 113-115, 133.)

6       In fact, the very day after allegedly reaching a deal with Mr. Sillerman,

7  Plaintiffs were already out for themselves, with Paolo openly discussing shopping

8  Disco Donnie and Insomniac to Y Entertainment Group, a competitor of SFX

9  affiliated with Ron Burkle and the Yucaipa Companies. (UF 78.) On January 10,

10  Paolo and Vavra exchanged further emails on the topic, with Vavra writing: "[I]ts

11  [sic] one of those things that I feel all of us are down for Sillerman so we should

12  throw a Pasquale offer out to Ron. Seriously, if they want to buy Donnie for

13  12mm, give us a huge piece and huge salaries (like 1.5mm a year each) and an open

14  checkbook we can consider." (UF 77.) That same day, Paolo emailed Frank

15  Quintero, a representative of the Yucaipa Companies, a summary of Disco

16  Donnie's business and stated: "This will help you lay out what Donnie is when you

17  brief RB [Ron Burkle, of Yucaipa] on the plan . . . . We are looking for someone

18  that wants to come in to the space as a partner that backs us, and believes in us."

19  (UF 78.)[4] Nearly a year later, with SFX still trying to acquire Insomniac, Gabe

20  interfered in the negotiations, reporting to Paolo that he (Gabe) had "basically just

21  squashed the Sillerman deal." (UF 148.) These communications stand in sharp

22  contrast to Plaintiffs' representations that Disco Donnie and Insomniac would form

23  the centerpieces of SFX's EDM rollup project, and demonstrate clearly that there

24  had been no meeting of the minds between Plaintiffs and Mr. Sillerman.

25       Plaintiffs' conduct over the next year demonstrates that Plaintiffs continued

26  _____

27  [4] Paolo's representation on January 10 that Plaintiffs were still looking for "a
   partner that backs us" demonstrates that Plaintiffs did not consider the alleged

28  agreement with Mr. Sillerman to form a joint venture/partnership. (UF 78.)

-12-

1   to work for themselves—not SFX.  For example, a few weeks later, on January 25,

2   2012, Paolo emailed Rick Stevens, another Yucaipa Company representative, with

3   acquisition terms for both Insomniac and Disco Donnie, as well as a list of

4   additional acquisition targets.  (UF 97.)  Additional examples of Plaintiffs'

5   shopping of the rollup plan, Disco Donnie, and Insomniac include: (a) informing

6   Yucaipa representatives on January 17 that "we are open to reopening a dialogue to

7   explore what a big picture deal would look like" (UF 81); (b) discussing

8   "collective" deals between Yucaipa and Disco Donnie on or about January 18

9   (UF 82); (c) fielding a large offer from LiveNation on or about January 19, and then

10   using that offer in an attempt to renegotiate Mr. Sillerman's proposed offer

11   (UF 85); (d) telling members of Yucaipa on January 19 that "we have explored our

12   options and at this point have not signed anything anywhere" (UF 87); and

13   (e) meeting with LiveNation on or after January 28 (UF 98).  As explained by

14   Mr. Estopinal, these negotiations included genuine offers to sell Disco Donnie

15   and/or its assets to SFX's competitors.  (UF 83.)

16         Additionally, although no one at SFX was aware of it at the time, Plaintiffs

17   arranged for and received commissions directly from the sellers of several

18   acquisition targets.  (UF 84, 113, 115, 133.)  These commissions were in the form

19   of a percentage of the price for which these targets were sold.  (*Id.*)  Plaintiffs

20   therefore received a direct monetary benefit from increasing the purchase price of

21   potential acquisition targets—to Defendants' detriment—at the same time Plaintiffs

22   were claiming to work "exclusively" for SFX.  (*See* UF 114.)

23   **H.   Plaintiffs Failed to Perform Services for SFX's Benefit.**

24         Despite Plaintiffs' initial representations that their personal connections

25   would drive acquisitions by SFX, it soon became clear that Mr. Estopinal's success

26   and reputation in the EDM industry were the central factors in convincing

27   acquisition targets to join the Company.  (UF 144-45.)  Plaintiffs admit as much.

28   (UF 154.)  Between January 2012 and May 2013, Messrs. Estopinal and Finkel

MEM. OF P. & A. IN SUPP. OF
DEFS.' MOT. FOR SUMM. J.

1  worked to open doors at potential acquisition targets and negotiate key points in

2  anticipation of a deal.  (UF 144-47, 150-52.)  Plaintiffs never facilitated any deals

3  on behalf of SFX, instead actively working against the Company by shopping

4  potential acquisition targets to competitors and accepting commissions from those

5  acquisition targets for the higher purchase prices Plaintiffs' double-dealing caused.

6  (*E.g.*, UF 80-85, 113-15.)  Finally, Plaintiffs failed to assist in any negotiations, and

7  relied on other professionals at SFX, including Messrs. Finkel and Nelson, to

8  negotiate and finalize the terms of each acquisition.  (UF 144-47, 150-53, 155-56.)

9  **III.   STANDARD FOR SUMMARY JUDGMENT**

10        Rule 56(a) of the Federal Rules of Civil Procedure requires courts to render

11  summary judgment if the evidence "show[s] that there is no genuine dispute as to

12  any material fact and that the movant is entitled to judgment as a matter of law."

13  Fed. R. Civ. P. 56(a).  Where, as here, Defendants do not bear the burden of

14  persuasion at trial, they are required only to show that there is an absence of

15  evidence to support an essential element of the nonmoving party's claim.  *In re*

16  *Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).[5]  This "absence of

17  evidence" can be shown either through presentation of evidence that "negates an

18  essential element of the nonmoving party's case," or demonstration that the

19  nonmoving party "failed to establish an essential element of [it]s case."  *Celotex*

20  *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Plaintiffs then bear the heavy burden of

21  proving by admissible evidence that there are triable issues of fact on the essential

22  elements of their claims.  *See In re Oracle*, 627 F.3d at 387 ("This burden is not a

23

24  [5] New York law is controlling under California's choice-of-law analysis, as all the
    relevant events identified in the Complaint took place in New York.  *See Costco*
25  *Wholesale Corp. v. Liberty Mut. Ins.*, 472 F. Supp. 2d 1183, 1197 (S.D. Cal. 2007)
    ("A federal court sitting in diversity must apply the choice-of-law rules of the
26  forum state."); *see id.* (denying motion to transfer but finding Connecticut, rather
    than California, law to control under California's choice-of-law analysis).
27
28  Regardless of which law applies, however, summary judgment is appropriate.

-14-

1  light one.  The non-moving party must show more than the mere existence of a

2  scintilla of evidence."); *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d

3  810, 815 (9th Cir. 1995) ("If the facts make a claim implausible, the non-movant

4  must present more persuasive evidence than would otherwise be necessary in order

5  to defeat a summary judgment motion." (internal quotation marks and citation

6  omitted)).  In this case, summary judgment is appropriate because Plaintiffs cannot

7  meet this heavy burden as to any of their claims.  Indeed, the undisputed facts make

8  Plaintiffs' claims implausible.

9  **IV.  SUMMARY JUDGMENT SHOULD BE GRANTED AS TO THE**
   **JOINT VENTURE/PARTNERSHIP CLAIMS BECAUSE THERE**

10  **WAS NO FORMATION OF ANY JOINT VENTURE/PARTNERSHIP**
    **AGREEMENT (CLAIMS 1-4)**

11

12  Joint ventures are analyzed using the same set of laws governing

13  partnerships. *See Scholastic, Inc. v. Harris*, 259 F.3d 73, 84 (2d Cir. 2001); *Myrick*

14  *v. Mastagni*, 185 Cal. App. 4th 1082, 1091 (2010).  To prove either a joint venture

15  or partnership, Plaintiffs bear the burden of establishing that either form of

16  fiduciary relationship existed, whether by express agreement or by implication. *See*

17  *Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y.

18  2004); *Stull v. Fox*, 2010 WL 3895538, at *6 (C.D. Cal. Oct. 4, 2010).  Plaintiffs

19  cannot meet this burden because:

20  (1)  There is no evidence showing that the parties reached any binding

21  agreement, much less that the parties reached an agreement

22  demonstrating mutual intent to share profits and losses, joint control

23  over and management of any proposed enterprise, or ownership of any

24  proposed enterprise.

25  (2)  No agreement can be implied through the parties' course of conduct

26  because none of the parties ever held themselves out to be joint

27  venturers/partners, Plaintiffs expressly disclaimed the existence of any

28

-15-

relationship with Defendants in their dealings with third parties, and there is no evidence showing that the parties intended to share profits and losses, joint control over and management of any proposed enterprise, or ownership of any proposed enterprise.

Plaintiffs' first through fourth claims for relief—each of which depend upon the existence of some fiduciary relationship—must therefore fail.

## A. The Parties Failed to Create a Joint Venture/Partnership by Express Agreement Because They Had Not Reached Any Binding Agreement by January 8, 2012.

In order to prove that a fiduciary relationship existed between the parties through express agreement, Plaintiffs are required to show that the terms of any alleged agreement were sufficiently definite to be enforced. *See Yonofsky v. Wernick*, 362 F. Supp. 1005, 1031 (S.D.N.Y. 1973) ("The first and most important element is, of course, the existence of a contract. . . . [T]here must be a specific agreement that the individuals are engaging in a joint enterprise before a joint venture can be established."); *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 210 (2006) (finding no joint venture/partnership agreement existed where the terms of the parties' alleged agreement were "fatally uncertain"). In this case, Plaintiffs contend that the joint venture/partnership was formed by the January 8 email exchange. (UF 67.) However, the undisputed evidence shows that: (i) the parties failed to reach any binding agreement by January 8, and, (ii) the material terms outlined by the parties in the January 8 email exchange do not reflect any joint venture/partnership, but rather, at most, reflect a proposed employment agreement and an offer for founders' shares in SFX (which was already in existence).

> i. *The Alleged Agreement Was Not Binding Because a Number of Open and Unresolved Terms Rendered It Fatally Uncertain and the Parties Manifested an Intent Not to Be Bound.*

It is well-settled that no legally binding joint venture/partnership agreement can be formed where "essential elements are reserved for future agreement."

1    *Goodworth Holdings Inc. v. Suh*, 239 F. Supp. 2d 947, 957 (N.D. Cal. 2002);

2    *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005) (finding no binding agreement

3    exists "where the parties contemplate further negotiations"). Here, the undisputed

4    evidence shows no binding agreement was formed because a number of basic

5    material terms remained open and unresolved, rendering any alleged agreement

6    fatally uncertain. Equally as dispositive, the parties' communications at that time—

7    and for months later—indisputably show an affirmative intent not to be bound by

8    any proposed terms that existed in January.

9         Among the issues that remained open following the January 8 email

10   exchange are:

11          • Whether Mr. Finkel, who presented Plaintiffs' proposal to

12            Mr. Sillerman on January 5, and Mr. Estopinal, who was included on

13            Plaintiffs' "team" and whose company was an acquisition target,

14            would be members of the alleged joint venture/partnership;

15          • The roles each proposed member would play in the alleged joint

16            venture/partnership;

17          • The division of profits and losses; and

18          • The structure of any business enterprise to be formed through the

19            alleged joint venture/partnership. (UF 70.)

20   These facts, alone, demonstrate that the parties never reached an express joint

21   venture/partnership agreement. *See Goodworth Holdings*, 239 F. Supp. 2d at 957

22   ("The term sheet indicates that the division of profits, who the parties to the

23   agreement would be, and what role each party would play in the transaction was not

24   determined. John Norman's name is included in brackets, . . . indicating that such

25   terms were unresolved. *This alone is dispositive*." (emphasis added)).[6]

26   _____

27   [6] *See also Bustamante*, 141 Cal. App. 4th at 215 ("[T]he undisputed facts here show
     no meeting of the minds as to the essential structure and operation of the alleged

28   joint venture, even if there was agreement on some of the terms."); *Precision*

1    Additionally, even a cursory review of the January 8 email exchange reveals

2    that none of the parties intended to be bound by the proposed terms.  Rather, both

3    sides indicated that the proposal would not be binding until the parties' respective

4    legal counsel reviewed those proposed terms and reduced them to a formal written

5    agreement.  (UF 61-66.)[7]  In fact, Plaintiffs' counsel was urged that the matter was

6    "very time sensitive," suggesting that any potential agreement might be lost through

7    delay.  (*Id.*)  Notwithstanding this admonition, the undisputed evidence shows that

8    the parties failed to reach any formal written agreement.  (UF 65.)  This fact is

9    dispositive.  *See Beck v. Am. Health Grp. Int'l, Inc.*, 211 Cal. App. 3d 1555, 1562

10   (1989) ("[W]here it is part of the understanding between the parties that the terms

11   of their contract are to be reduced to writing and signed by the parties, the assent to

12   its terms must be evidenced in the manner agreed upon or it does not become a

13   binding or completed contract."); *Langer v. Dadabhoy*, 843 N.Y.S.2d 262, 262

14   (N.Y. App. Div. 2007) ("[E]mails conclusively established that the parties intended

15   to finalize their agreement in a writing, which never materialized . . . . As such,

16   there was no mutual assent or meeting of the minds as to the proposed joint

17   venture." (internal citations omitted)).

18        The fact that both sides referred to the terms as "proposed" or otherwise

19   encompassing "the *first moving part* of the deal" further demonstrates that the

20   January 8 email exchange was not intended to create a binding agreement.  (UF 65-

21   66.)  Plaintiffs' subsequent correspondence, in which they disclaimed to others

22   having reached a binding agreement with SFX and continued to shop their services

23   

24   *Testing Labs., Ltd. v. Kenyon Corp. of Am.*, 644 F. Supp. 1327, 1345 (S.D.N.Y.
     1986) (finding no joint venture/partnership agreement existed and stating, "[T]he
25   parties could not come to an agreement on at least two essential terms of their
     understanding and left them unresolved[.]").
26   

27   [7] These statements on January 8 echo the parties' previous commitment that no
     agreement would be binding until legal counsel had the opportunity to review the
28   proposed terms and reduce them to writing.  (UF 61-62.)

-18-

1   to SFX's competitors, confirms that Plaintiffs never intended to form any

2   agreement with Defendants.  For example, when representatives from the Yucaipa

3   Companies asked whether Plaintiffs had already reached a deal, Paolo openly

4   disclaimed any binding agreement with Defendants and held Plaintiffs out as doing

5   business for themselves.  (UF 87, 106, 108.)  Paolo described the employment

6   proposal from Defendants as "yuck," and sought to negotiate better terms with

7   Yucaipa on multiple occasions.  (UF 87.)  On February 20, 2012—more than six

8   weeks after Plaintiffs now contend some agreement had been reached—Paolo

9   expressly disclaimed the existence of any binding agreement in email

10  communications with Mr. Estopinal and Mr. Estopinal's assistant.  (UF 108.)

11  Specifically, Paolo stated:  "Contract should not say SFX just DPI *we were talking*

12  *with them but did nothing with them* not sure how this came into the agreement[.]"

13  (*Id.* (emphasis added).)  These communications clearly demonstrate a lack of any

14  intent to be bound by the terms encompassed by the January 8 email exchange.

15          Instead of reaching a binding agreement, the parties continued to negotiate

16  terms for more than a year following the January 8 email exchange, during which

17  time Plaintiffs continually shopped their services to competitors.  (*See* UF 74, 77-

18  78, 80-83, 85, 87.)  For instance, on January 9, Paolo and Vavra openly discussed

19  accepting a deal from another party if they received a better offer.  (UF 78.)  That

20  same day, Paolo emailed Mr. Sillerman, seeking to change his proposed salary from

21  $300,000 to $500,000.  (UF 74.)  On January 19, 2012, Paolo emailed Finkel

22  describing the offer from SFX as "a joke" and claiming that he received a better

23  offer from Live Nation a week earlier.  (UF 85.)  Attorney LaVina also continually

24  sent revised agreements that included new or modified material terms.  (UF 86,

25  104, 119.)  Under similar circumstances, courts routinely find no binding agreement

26  to exist.  *See, e.g.*, *Brown*, 420 F.3d at 153 (finding no binding agreement existed

27  because, just days after the parties' alleged agreement was reached, they "enter[ed]

28  negotiations toward the execution of significant and necessary agreements,

-19-

1  demonstrating the parties' contemporary understanding that . . . further negotiations

2  and formal agreements were necessary").[8]

3         ii.    *The Parties' Proposed Terms Are Insufficient to Create a Joint
4                Venture/Partnership.*

5         Plaintiffs are also unable to show that the proposed terms created a joint

6  venture/partnership.  Plaintiffs singularly rely upon an email from Paolo to Mr.

7  Sillerman in which Paolo states, "We are officially partners . . . ."  (UF 61.)

8  However, this statement preceded months of Plaintiffs' renegotiation of terms and

9  is contradicted by Plaintiffs' later statements in which they disclaimed having any

10  relationship with Defendants.  (*Id.*; UF 86-87, 106, 108, 119.)  Moreover, the law is

11  clear that this characterization of the parties' relationship as being "partners" is

12  insufficient to create a legal joint venture/partnership.  *See, e.g., Louis Lesser*

13  *Enters.*, 209 Cal. App. 2d at 408 ("Although the letters employ the terms 'joint

14  venture' and 'partnership,' we agree with appellants that whatever appellation the

15  parties may have given their association for the purpose of reference it is in fact the

16  nature of the relationship, if any, intended or actually created, rather than the title

17  which controls.").[9]  Instead, Plaintiffs are required to show that *both* parties

18  _____

19  [8] *Fredianelli v. Jenkins*, 931 F. Supp. 2d 1001, 1016-17 (N.D. Cal. 2013) ("Where
   it is part of the understanding between the parties that the terms of their contract are
20  to be reduced to writing and signed by the parties, the assent to its terms must be
   evidenced in the manner agreed upon or it does not become a binding or completed
21  contract." (internal modifications and quotation marks omitted)); *Louis Lesser*
22  *Enters., Ltd. v. Roeder*, 209 Cal. App. 2d 401, 405 (1962) ("[W]here the parties
   understood that the proposed agreement is not complete until reduced to formal
23  writing and signed, no binding contract results until this is done.").

24  [9] *See also Heck v. Voelke*, 160 N.Y.S. 903, 905 (1916) ("The parties held
25  themselves out in some respects as partners, . . . but these acts, in the face of their
   written contract, while it might be evidence to create a liability on the part of both
26  of them to creditors, did not change the contractual relation between them from one
27  of employment to one of partnership."); *In re Lona*, 393 B.R. 1, 16 (N.D. Cal.
   2008) ("[T]he existence of a partnership is not determined by the parties'
28  designation of their arrangement."); 59A Am. Jur. 2d *Partnership* § 137 ("The mere

-20-

*intended* to form a joint venture/partnership through which they would share profits and losses, joint control over and management of the proposed enterprise, and ownership over the proposed enterprise. *See Kidz Cloz, Inc.*, 320 F. Supp. 2d at 171 (no joint venture/partnership exists unless both parties intend such a relationship to form); *Holmes v. Lerner*, 74 Cal. App. 4th 442, 454 (1999) ("[T]he rules to establish the existence of a partnership . . . should be viewed in the light of the crucial factor of the intent of the parties revealed in the terms of their agreement, conduct, and the surrounding circumstances."). Because the parties never intended to form a joint venture/partnership, much less reach any agreement on the division of profits and losses, joint control, and ownership, Plaintiffs' first claim for relief must fail.

First, as discussed above, the parties did not intend the terms outlined in the January 8 email exchange to be binding, and certainly did not intend to form a joint venture/partnership at that time. (UF 70.) Mr. Sillerman has stated unequivocally that he never intended any joint venture/partnership, and there is no evidence of any objective intent from either Mr. Sillerman or Plaintiffs to form a joint venture/partnership. (UF 69.) In fact, Plaintiffs have, out of their own mouths, disclaimed the existence of any joint venture/partnership in numerous communications made prior to this lawsuit. (*E.g.*, UF 108.) Gabe has even gone so far as to admit that he never knew the proposed terms and never gave Paolo the authority to enter into any agreement on Gabe's behalf. (UF 165.) It is axiomatic that the parties could not have formed a joint venture/partnership when one of the purported members neither knew of the proposed terms nor gave his consent to enter into such a relationship.

Second, the terms contemplated as of January 8, 2012 contained none of the elements of a joint venture/partnership. There is no evidence that the parties

---

fact that parties call themselves partners and refer to their business relation as a partnership will not necessarily make them partners, nor their business a partnership.").

MEM. OF P. & A. IN SUPP. OF
DEFS.' MOT. FOR SUMM. J.

1   discussed, much less agreed to, any provision regarding the division of profits and

2   losses among the parties. (UF 70.)[10]  This is a fatal flaw.  *See Brown*, 420 F.3d at

3   160 (finding that no joint venture/partnership exists where the parties have not

4   specifically provided "for a sharing of losses"); *Oakland Raiders v. National*

5   *Football League*, 131 Cal. App. 4th 621, 637-38 (2005) ("A joint venture, of

6   necessity, requires an agreement under which the parties have . . . an understanding

7   that profits *and losses* will be shared." (emphasis added) (internal quotation marks

8   omitted)).  At most, the alleged agreement provided that Plaintiffs would receive

9   annual salaries and other compensation for their services—a provision that is

10  inconsistent, as a matter of law, with the creation of any joint venture/partnership.

11  *See Marquart v. Smith*, 2014 WL 1990286, at *2 (Cal. Ct. App. May 16, 2014) ("A

12  partner is not entitled to remuneration for services performed for the partnership."

13  (quoting Cal. Corp. Code § 16401(h))); *In re Dewey & LeBoeuf LLP*, 518 B.R. 766,

14  787 (S.D.N.Y. 2014) ("[N]o partner is entitled to remuneration for acting in the

15  partnership business." (quoting N.Y. P'ship Law §40(6))).

16         Further, the parties never reached any agreement providing for joint control

17  over and management of their proposed enterprise or joint ownership of their

18  proposed enterprise.  Rather, the undisputed evidence shows that SFX had

19  previously been founded by Mr. Sillerman and was controlled by him as the

20

21  [10] Plaintiffs' contention that section 16401, subsection (b) of the California
    Corporate Code creates a default rule entitling them to share profits equally puts the
22  metaphorical cart before the horse. (*See* Declaration of William F. Sullivan, Ex.
    WS3 at 7.)  As expressed in *Bustamante*, that provision is inapplicable unless
23  Plaintiffs can establish that the parties "expressly agree[d] to associate as co-owners
    with the intent to carry on a business for profit."  141 Cal. App. 4th at 213.
24  Plaintiffs can put forth no evidence satisfying this requirement.  Moreover, even if
    that statutory scheme were capable of providing for the sharing of profits between
25  the parties, there is no evidence of any provision for the sharing of losses—a fatal
26  flaw.  *See Brown*, 420 F.3d at 160 (finding no joint venture/partnership had been
    formed because the parties' alleged agreement "[did] not adequately provide for the
27  sharing of losses").

28

-22-

majority shareholder at all times.  (UF 21-22, 53-54.)  Plaintiffs would, at most, have been employed to manage a wholly-owned subsidiary of SFX.  Specifically, the January 8 email exchange that forms the basis of Plaintiffs' joint venture/partnership claims contained the following exchange:

> [Mr. Sillerman:]  Thus here's what I propose for our deal:  You take control of our new Electronic music subsidiary.  You Receive 1MM shares of SFX stock. . . .
>
> [Paolo:]  What ownership would I have in the subsidiary? . . .
>
> [Mr. Sillerman:]  ***Subsidiaries are wholly owned by SFX.***  . . . You will receive shares in SFX immediately before it merges into and thus becomes public.

(UF 53-54.)  Had the parties been able to reach any binding agreement following January 8, Plaintiffs would have been entitled to—at most—founders' shares, *i.e.*, shares of common stock in SFXE.  (*See id.*)  Holding founders' shares provides no indicia of the joint ownership or sharing of profits required of joint venturers or partners.  *See Sole Energy Co. v. Petrominerals Corp.*, 128 Cal. App. 4th 212, 233 (2005) ("As shareholders, [plaintiffs] would have had no right to receive those corporate profits.").  Further, the terms clearly contemplated that Plaintiffs would "take control of [SFXE's] new Electronic music subsidiary," and become salaried employees of that subsidiary, while Mr. Sillerman maintained ultimate control over the parent corporation and business enterprise.  (UF 52.)  As Plaintiffs admitted in deposition, this arrangement would require them to seek Mr. Sillerman's authorization or approval for any decision they wished to make, and therefore denied Plaintiffs the joint control and management required of joint ventures/partnerships.  (UF 154); *see Jacobsen v. Marin Gen. Hosp.*, 192 F.3d 881, 887 (9th Cir. 1999) (finding no joint venture/partnership existed because "[h]ad the defendants exercised equal control . . . it would not have been necessary for [one] to obtain permission" from the other); *Fredianelli*, 931 F. Supp. 2d at 1020 (finding

-23-

1    no joint venture/partnership existed because "Plaintiff was effectively shut out of

2    the [enterprise]'s decision-making process.  Rather, [Defendant] had the final say as

3    to all creative and business decisions of the [enterprise.]").  Because Plaintiffs

4    cannot establish that the alleged agreement contained any provision for the joint

5    ownership of or joint control over and management of the proposed enterprise, no

6    joint venture/partnership could exist.[11]

7    **B.    The Parties' Course of Conduct Was Insufficient to Establish a**

8    **Joint Venture/Partnership Because They Never Shared Profits,**
     **Joint Control, or Ownership of the Proposed Enterprise, and**

9    **Plaintiffs Held Themselves Out as Being Independent of SFX.**

10       Plaintiffs' second claim for relief requires the same showing as the first—that

11   the parties intended to form a joint venture/partnership through which they would

12   share profits and losses, joint control over and management of the proposed

13   enterprise, and ownership of the proposed enterprise.  *See Kidz Cloz, Inc.*, 320 F.

14   Supp. 2d at 171; *Holmes*, 74 Cal. App. 4th at 454; *Brown*, 420 F.3d at 160; *Oakland*

15   *Raiders*, 131 Cal. App. 4th at 637-38.  Summary judgment on this claim is

16   appropriate because Plaintiffs can put forth no evidence showing that the parties'

17   course of conduct remedied any of the deficiencies described above.

18       First, throughout the parties' course of dealing, both parties maintained that

19   no fiduciary relationship would exist unless and until the terms of that relationship

20   were reduced to a formal written agreement.  (UF 61-66, 69.)  Plaintiffs made

21   numerous statements indicating that they understood no relationship existed in the

22

23   [11] To the extent Plaintiffs contend that the deficiencies described above were
     resolved by oral agreement on January 9, 2012, this contention was roundly

24   rejected by Plaintiffs themselves through deposition testimony.  (UF 67.)  In any
     event, any alleged oral agreement upon which Plaintiffs' claims could be predicated

25   would be precluded by New York's statute of frauds.  *See Stratavest v. Rogers*, 888
     F. Supp. 35, 38 (S.D.N.Y. 1995) (finding that where a joint venture/partnership

26   agreement has no fixed term, it is terminable at will); *McElroy v. Gemark Alloy*

27   *Refining Corp.*, 592 F. Supp. 2d 508, 521 (S.D.N.Y. 2008) (applying New York's
     statute of frauds to alleged oral joint venture/partnership agreement).

28
                                              -24-

1   absence of a formal written agreement. (*Id.*) Further, Plaintiffs repeatedly

2   informed other parties that they had reached no agreement and formed no

3   relationship with Mr. Sillerman. (UF 87, 106, 108.) In fact, both sides dealt with

4   other parties independently: Defendants negotiated and entered into agreements

5   with Disco Donnie and other acquisition targets as the corporation, "SFX

6   Entertainment, Inc.," not as a joint venture/partnership with Plaintiffs. (UF 130.)

7   Plaintiffs, meanwhile, represented that they were independent from SFX and still

8   "looking for someone that wants to come into the space as a partner and back us."

9   (UF 78.) In sum, the undisputed evidence shows that the parties had no intent to

10  form a joint venture/partnership as of January 8, 2012 and had no intent to form any

11  such relationship thereafter.

12         Second, the course of the parties' conduct confirms that Plaintiffs never

13  shared profits and losses with Mr. Sillerman, and never had joint control over and

14  management of the proposed enterprise. Plaintiffs admitted that they earned

15  commissions on the very same deals they claim to have been "facilitating" on

16  behalf of the alleged joint venture/partnership. (UF 84, 113-115, 133.) However,

17  there is no evidence that Plaintiffs shared (or offered to share) these profits with

18  Mr. Sillerman. Nor have Plaintiffs taken any responsibility for the alleged joint

19  venture/partnership's losses or offered to share financial liabilities with

20  Mr. Sillerman. (UF 68.) In fact, Plaintiffs have admitted that Mr. Sillerman was

21  solely responsible for any financial risks. (*Id.*) Finally, Plaintiffs never exerted any

22  control over the alleged joint venture/partnership. Instead, throughout 2012 and

23  2013, Plaintiffs reported to Mr. Sillerman, sought his approval of various deals, and

24  held him out as having ultimate control over the alleged joint venture/partnership.

25  (UF 154.) Such a course of conduct cannot form any implied-in-fact joint

26  venture/partnership agreement, and summary judgment is therefore appropriate.[12]

27

28  [12] Even if Plaintiffs could establish that some joint venture/partnership agreement

-25-

### C. Plaintiffs' Breach of Fiduciary Duty and Constructive Fraud Claims Must Be Dismissed Because Defendants Owed No Fiduciary Duties in the Absence of a Joint Venture/Partnership.

Plaintiffs' claims regarding breach of fiduciary duty and constructive fraud are derivative of their joint venture/partnership claims. (*See* Cmpl. at ¶¶ 59, 65 (describing any alleged fiduciary relationship as arising out of the alleged joint venture/partnership).) Because the parties did not form any joint venture/partnership, as detailed above, Mr. Sillerman owed no fiduciary duties to Plaintiffs, and their breach of fiduciary duty and constructive fraud claims fail as a matter of law. *See Kidz Cloz, Inc.*, 320 F. Supp. 2d at 176 (dismissing claims based on fiduciary duties arising out of joint venture/partnership where alleged joint venture/partnership did not exist); *Suh*, 239 F. Supp. 2d at 960 (same).

### V. PLAINTIFFS' CONTRACT AND QUASI-CONTRACT CLAIMS FAIL BECAUSE THERE WAS NO FORMATION OF ANY BINDING AGREEMENT AND PLAINTIFFS CANNOT PROVE ANY PERFORMANCE OR REASONABLE RELIANCE (CLAIMS FOR RELIEF 5-7, 11)

Plaintiffs' contract, promissory estoppel, and *quantum meruit* claims each rely upon the same January 8 email exchange discussed above, which Plaintiffs

---

existed between the parties, that agreement had no fixed term and was therefore terminable at will. *See Stratavest*, 888 F. Supp. at 38 (joint venture/partnership with no fixed term is terminable at will). Defendants could not have breached such an agreement as a matter of law. *See Scholastic, Inc.*, 259 F.3d at 87 ("[A] joint venture at will may be dissolved by 'conduct as well as words,' [and] occurs when either party manifests 'an unequivocal election' to cease the collaboration." (internal citations omitted)). Further, Plaintiffs' wrongful conduct in refusing to work for the proposed enterprise, actively working against the interests of Defendants, and failing to share the profits of their commissions with Mr. Sillerman terminated any existing joint venture/partnership well in advance of Defendants' alleged breach. *See Simons v. Ross*, 765 N.Y.S.2d 859, 860 (N.Y. Sup. Ct. 2003) (failure to contribute profits and otherwise participate in joint venture/partnership constitutes a repudiation of that joint venture/partnership); 16 N.Y. Jur. 2d *Business Relationships* § 2129; Cal. Corp. Code § 16801(1)-(2) (governing dissolution of partnerships); *Zeibak v. Nasser*, 12 Cal. 2d 1 (1938) (finding statute governing dissolution of partnerships applicable to joint ventures).

MEM. OF P. & A. IN SUPP. OF
DEFS.' MOT. FOR SUMM. J.

1   alternately characterize as having formed a contract, a promise, and an agreement

2   implied-in-law to pay Plaintiffs for their reasonable services. (*Compare* Cmpl. at

3   ¶ 73 (contract), *with* ¶¶ 86, 92 (promise), *with* ¶ 81 (agreement implied-in-law).)

4   Summary judgment is appropriate as to each of these claims because: (1) no

5   contract was ever formed, and (2) Plaintiffs never performed services for

6   Defendants' benefit, and certainly did not do so in reliance upon any agreement or

7   promise that they would be compensated for those services.

8        **A.    Plaintiffs' Contract Claims Fail Because the Parties' Ongoing**

9            **Negotiations Never Resulted in Any Binding and Enforceable Contract.**

10       The fundamental question as to whether an enforceable contract exists is

11  whether there has been "a meeting of the minds on all essential terms." *Benicorp*

12  *Ins. v. National Med. Health Card Sys., Inc.*, 447 F. Supp. 2d 329, 337 (S.D.N.Y.

13  2006); *Siegel v. Warner Bros. Entm't Inc.*, 542 F. Supp. 2d 1098, 1137 (C.D. Cal.

14  2009) ("[T]here is no contract until there has been a meeting of the minds on all

15  material points."). "The failure to reach a meeting of the minds on all material

16  points prevents the formation of a contract even if the parties have orally agreed

17  upon some of the terms or have taken some action related to the [alleged] contract."

18  *Siegel*, 542 F. Supp. 2d at 1137. Whether such a meeting of the minds has occurred

19  is to be resolved by evaluating the totality of the circumstances. *Benicorp*, 447 F.

20  Supp. 2d at 337; *see Siegel*, 542 F. Supp. 2d at 1137 (evaluating whether a contract

21  was formed by reviewing the parties' correspondence and conduct both at the time

22  of the alleged agreement and subsequent thereto). Here, a brief timeline of the

23  parties' negotiations leaves no question that the parties failed to reach agreement on

24  all material terms:

25       •  **January 9, 2012:** Paolo emails Mr. Sillerman, attempting to

26         renegotiate his proposed salary from $300,000 to $500,000. (UF 74.)

27       •  **January 16, 2012:** Defendants' counsel emails a proposed

28

-27-

employment offer letter to Paolo and Attorney LaVina. (UF 79.)

- **January 19, 2012:**  Attorney LaVina responds, seeking to add a discretionary bonus, a non-discretionary bonus (which had previously been rejected by Mr. Sillerman as potentially creating "mis-aligned interest[s]"), and a number of perks and benefits into the proposed employment offer letter. (UF 86.)

- **January 25, 2012 (2:30 PM):**  Defendants' counsel further revises the employment offer letters, removing most of the provisions inserted by Plaintiffs on January 19. (UF 91.) **(5:36 PM):** Paolo responds, indicating salaries and equity allocation need to be revised and stating, "I will email Bob later with my thoughts for approval." (UF 92.)

- **February 23, 2012:**  Paolo emails Mr. Sillerman, expressing concern over non-compete clauses and equity allocation. (UF 109.)

- **April 23, 2012:**  Attorney LaVina further revises the proposed employment agreement, removing the non-compete clause, changing the for-cause termination clause, and adding a provision for annual salary increases of 10%. (UF 119.)

- **May 16, 2012:**  Defendants' counsel further revised the proposed employment agreement, substantially reworking the language inserted by Plaintiffs on April 23. (UF 122.)

- **January 8, 2013:**  Vavra exchanges emails with Defendants' counsel and Mr. Finkel, attempting to change the proposal that he work full-time for SFX. (UF 158.)  Paolo later states that he intends to push through the same revisions for himself and Gabe. (UF 160.)

The full scope of the parties' correspondence shows that they never reached agreement as to a number of key terms, including Plaintiffs' compensation and the terms of their employment.  This back and forth precludes any finding that a contract existed, and reveals that the January 8 email exchange was, at most, a mere

-28-

1    preliminary agreement or an "agreement to agree."  As cogently explained by the

2    court in *Siegel*:

> 3    This give and take reveals that the parties, while close to agreeing to a
>
> 4    complete and comprehensive settlement of their dispute, had not
>
> 5    passed the threshold where they had finalized and assented to all
>
> 6    material terms of such a settlement.   Rather, as they attempted to
>
> 7    sketch in the finer details . . . from the broad outlines contained in the
>
> 8    October 19 letter, more and more issues arose upon which they could
>
> 9    not reach agreement, resulting in the negotiations falling apart.

10   542 F. Supp. 2d at 1137.  Such preliminary agreements are simply not enforceable

11   as a matter of law.  *See Bustamante*, 141 Cal. App. 4th at 213 (finding "agreements

12   to agree" to be unenforceable); *Brown*, 420 F.3d at 157 (finding "agreements to

13   agree" unenforceable because they create, at most, an obligation to continue

14   negotiations in good faith).[13]

15   **B.    Plaintiffs' Quasi-Contract Claims Fail Because Plaintiffs Never
            Performed Services for Defendants' Benefit and Certainly Did Not
16            Do So in Reliance on Any Agreement or Promise.**

17         Plaintiffs' promissory estoppel and *quantum meruit* claims fail for the

18   additional reason that Plaintiffs never performed services *for* Defendants, but were

19   at all times acting on their own behalf.  Under either quasi-contract theory,

20   Plaintiffs must show some type of performance.  *See US Ecology, Inc. v. State*, 129

21   Cal. App. 4th 887, 901 (2005) (promissory estoppel claim requires showing that

22   plaintiff reasonably relied on defendant's promise and was injured by that reliance);

23   *Cedars Sinai Med. Ctr. v. Mid-W. National Life Ins.*, 118 F. Supp. 2d 1002, 1013

24

25   [13] Additionally, no meeting of the minds could exist until the parties executed a
26   formal written agreement.  (UF 61-66, 69); *see Langer*, 843 N.Y.S.2d at 262
     ("[E]mails conclusively established that the parties intended to finalize their
27   agreement in a writing, which never materialized . . . . As such, there was no mutual
28   assent or meeting of the minds . . . ." (internal citations omitted)).

-29-

1   (C.D. Cal. 2000) (*quantum meruit* claim requires showing that plaintiff performed

2   services for the benefit of defendant at defendant's request).[14]

3         As to promissory estoppel, Plaintiffs contend that they performed by

4   "working immediately, full-time, for SFX" and "turn[ing] down other lucrative

5   offers in reasonable reliance on Mr. Sillerman's promise." (Cmpl. at ¶ 87.)

6   However, the undisputed evidence shows that Plaintiffs never worked ***for*** SFX.  For

7   example, despite the fact that Mr. Sillerman instructed Plaintiffs to stop speaking

8   with other potential investors, Plaintiffs continued to shop their services and

9   acquisitions targets to SFX's competitors.  (UF 84, 113-115, 133.)  Plaintiffs did so

10  for their own personal benefit, in order that they might drive prices higher and

11  obtain larger commissions from their acquisition targets.  (UF 84, 114.)  In

12  addition, throughout the relevant time period, Gabe continued to work for Mr.

13  Rotella at Insomniac, going so far as to "squash" a potential deal between

14  Insomniac and Mr. Sillerman to Defendants' detriment.  (UF 114, 148, 165.)

15  Similarly, Vavra continued to devote the majority of his time to Deckstar, failing to

16  provide services to SFX.  (UF 105, 158.)  These facts demonstrate that Plaintiffs

17  never relied upon any alleged promise but instead continued to act in whichever

18  manner benefitted them.  Additionally, the fact that Plaintiffs received commissions

19  and other remuneration from third parties for their conduct demonstrates that they

20  were never injured.  (UF 84, 113-115, 133.)[15]

21  _____

22  [14] *See also MatlinPatterson ATA Holdings LLC v. Fed. Express Corp.*, 929
    N.Y.S.2d 571, 577 (N.Y. App. Div. 2011) (stating elements of promissory

23  estoppel); *Pulver Roofing Co. v. SBLM Architects, P.C.*, 884 N.Y.S.2d 802, 802

24  (N.Y. App. Div. 2009) (stating elements of *quantum meruit*).

25  [15] Further, as discussed above, the parties agreed not to be bound by any proposals
    until the terms were reviewed by legal counsel and reduced to a formal written

26  agreement.  (*E.g.*, UF 66.)  This precludes any finding that Plaintiffs' reliance was

27  reasonable.  *See Prospect Street Ventures I, LLC v. Eclipsys Solutions Corp.*, 804
    N.Y.S.2d 301, 301 (N.Y. App. Div. 2005) (rejecting promissory estoppel claim

28  because it was unreasonable for plaintiffs to rely upon an "agreement to agree"

As to Plaintiffs' *quantum meruit* claim, the conduct described above demonstrates that Plaintiffs never performed services for Defendants' benefit. Rather, Plaintiffs continued to work exclusively for themselves, and were compensated by other parties for doing so.  (UF 84, 113-115, 133.)  Under these facts, it is clear that Plaintiffs could not succeed on their *quantum meruit* claim even if they were otherwise able to prove that Defendants somehow benefitted from Plaintiffs' double-dealing.  *See Cedars Sinai*, 118 F. Supp. 2d at 1013 (finding *quantum meruit* claim requires proof of reasonable value of services and that the value remains unpaid).  In any event, Plaintiffs' conduct harmed, rather than benefitted, Defendants by causing them to expend additional funds in attempting to purchase target acquisitions.  (UF 84, 114.)

## VI.   SUMMARY JUDGMENT SHOULD BE GRANTED AS TO PLAINTIFFS' FRAUD-BASED CLAIMS BECAUSE THERE IS NO EVIDENCE OF FRAUDULENT INTENT OR REASONABLE RELIANCE (CLAIMS FOR RELIEF 8-9)

Plaintiffs' separate claims for fraudulent inducement and promissory fraud both rely upon the same alleged facts and are, for all intents and purposes, a subspecies of a common-law fraud claim.  *See Bell v. Fed. Home Loan Mortg. Corp.*, 2012 WL 4576584, at *3 (S.D. Cal. Oct. 1, 2012) ("The tort of fraudulent inducement to enter a contract, *also known as promissory fraud*, is a 'subspecies of the action for fraud and deceit' and lies 'where a defendant fraudulently induces a plaintiff to enter into a contract.'"  (emphasis added) (quoting *Lazar v. Superior Court (Rykoff-Sexton, Inc.)*, 12 Cal. 4th 631, 638 (1996))).  In order to succeed in proving fraud, Plaintiffs must show that the misrepresentations alleged in the Complaint:  (1) were made with knowledge of falsity and intent to defraud, and

expressly conditioned upon the execution of a definitive agreement); Banks, Glen, 28 N.Y. Prac., *Contract Law* § 4:23 (2014) ("When a preliminary agreement states that the parties would not enter into a transaction until the parties executed a definitive agreement, a party cannot use a promissory estoppel theory to recover its costs in pursuing an agreement that never came to fruition.").

1   (2) were justifiably relied upon by Plaintiffs, resulting in damage.  *See Lazar*, 12

2   Cal. 4th at 638 (outlining elements of fraudulent inducement / promissory fraud).[16]

3   Plaintiffs can satisfy neither of these requirements.

4       **A.**    **Plaintiffs' Fraud-Based Claims Fail as a Matter of Law Because**

5                     **There Is No Evidence That Any Misrepresentation Was Made with Fraudulent Intent.**

6       In order to succeed on their fraud-based claims, Plaintiffs must show that

7   Mr. Sillerman "made a misrepresentation of fact or a promise without any intention

8   of performing it."  *Serv. by Medallion, Inc. v. Clorox Co.*, 44 Cal. App. 4th 1807,

9   1816 (1996).  "[T]he essence of the fraud is the existence of an intent *at the time of*

10  *the promise* not to perform it."  *Building Permit Consultants, Inc. v. Mazur*, 122

11  Cal. App. 4th 1400, 1414 (2004) (emphasis added).  In other words, "the falsity of

12  the promise and the knowledge of that falsity (scienter) are interconnected.  A

13  promise is only false if the promisor did not intend to perform the promise when it

14  was made, *i.e.*, had knowledge of its falsity."  *Beckwith v. Dahl*, 205 Cal. App. 4th

15  1039, 1061-62 (2012); *see Lazar*, 12 Cal. 4th at 638.

16      In this case, Plaintiffs have alleged that Mr. Sillerman made two fraudulent

17  misrepresentations of fact or false promises: First, Plaintiffs allege that in

18  January 2012, Mr. Sillerman fraudulently told them that he would partner with

19  them and agreed to certain terms of a business enterprise.  (*See* Cmpl. at ¶¶ 92,

20  104.)  Second, Plaintiffs allege that on May 31, 2012, Mr. Sillerman fraudulently

21  told them that they would be receiving founders' shares pursuant to the parties'

22  alleged earlier agreement.  (*See id.* at ¶¶ 97, 108.)[17]  Plaintiffs contend these alleged

23  

24  [16] *See also MBIA Ins. v. Credit Suisse Sec. (USA) LLC*, 927 N.Y.S.2d 517, 530 (N.Y. Sup. Ct. 2011) (stating fraudulent inducement/promissory fraud elements).

25  [17] To the extent Plaintiffs have not alleged and cannot show any fraud apart from

26  alleged non-performance, summary judgment must be granted.  *See Pac. Bus. Cap.*

27  *Corp. v. Globex Brands, Inc.*, 2011 WL 66337, at *2 (C.D. Cal. Jan. 7, 2011) (rejecting "attempted repackaging of [the] breach of contract claim"); *Frontier-*

28  *Kemper Constr'rs, Inc. v. Am. Rock Salt Co.*, 224 F. Supp. 2d 520, 527 (W.D.N.Y.

1   misrepresentations were intended to convince Plaintiffs to enter into a business
2   enterprise with Mr. Sillerman and forego other business opportunities. (*See id.* at
3   ¶¶ 94, 104.) However, there is no evidence that would support these allegations.
4        The undisputed evidence shows that Mr. Sillerman and Plaintiffs turned the
5   preparation of employment agreements to their respective lawyers in January 2012.
6   (UF 61-66, 69.) The evidence further shows that immediately hereafter, Plaintiffs
7   began attempting to renegotiate the proposed terms in order to obtain a better
8   bargain for themselves. (UF 74, 86.) Mr. Sillerman, through counsel, continued to
9   negotiate towards a final, binding agreement with Plaintiffs, sending multiple
10  proposed agreements to Plaintiffs and their counsel for review and execution.
11  (UF 79, 91.)[18] The fact that Plaintiffs never executed these agreements is
12  insufficient to show that Mr. Sillerman had any fraudulent intent; if anything, it
13  shows that Plaintiffs intended to defraud Defendants, telling Mr. Sillerman that
14  Plaintiffs would work exclusively for SFX but continuing to thwart SFX's business
15  interests by shopping potential acquisition targets to SFX's competitors. (UF 78.)

**B.**    **Plaintiffs' Fraud-Based Claims Fail As a Matter of Law Because Plaintiffs Cannot Establish Any Justifiable Reliance.**

18       Plaintiffs' fraudulent inducement/promissory fraud claims fail for the
19  additional reason that Plaintiffs never relied upon any of the alleged
20  misrepresentations. Although Plaintiffs contend that they "turned down other

---

22  2002) ("[S]imply dressing up a breach of contract claim by further alleging that the
23  promisor had no intention, at the time of the contract's making, to perform its
    obligations thereunder, is insufficient to state an independent tort claim.").

24  [18] Further, by late spring 2012, it had become increasingly clear that Plaintiffs had
25  misrepresented not only their personal backgrounds, but also their connections in
    the EDM industry, their loyalty to the SFX, and their intention to make SFX their
26  "sole project" and to work "24/7" in furtherance of the business. (UF 76.) In light
27  of these misrepresentations and the parties' ongoing negotiations, Mr. Sillerman, as
    the true owner of the founders' shares, had complete discretion to distribute the
28  shares in any manner he saw fit. (UF 126.)

1    lucrative opportunities" in reliance upon the alleged misstatements, this contention
2    is contradicted by the evidence, which shows that Plaintiffs actually acted against
3    the interests of Mr. Sillerman and SFX, always seeking to obtain greater benefits
4    for themselves by shopping potential acquisitions to SFX's competitors.  (UF 77-
5    78, 80-83, 85, 87.)[19]  Through their double-dealing, Plaintiffs received a number of
6    commissions and other benefits—often to SFX's detriment.  (UF 84, 113-115, 133.)
7    Under these facts, summary judgment is appropriate.

8    **VII.  PLAINTIFFS' UNFAIR COMPETITION CLAIM FAILS AS A**
         **MATTER OF LAW BECAUSE THEIR CASE INVOLVES A**
9        **PRIVATE, CONTRACT-BASED MATTER (CLAIM FOR RELIEF 10)**

10          Plaintiffs vaguely allege that Defendants' conduct, as described in the
11   Complaint "constitutes an unfair and unlawful business practice in violation of
12   Sections 17200, *et seq.* of the California Business and Professions Code."  (Cmpl.
13   at ¶ 116.)  This claim is wholly misplaced.

14          First, Plaintiffs cannot offer any evidence that Defendants engaged in any
15   "unfair" business practice that falls within the scope of the UCL.  *See Gregory v.*
16   *Albertson's, Inc.*, 104 Cal. App. 4th 845, 850 (2002) (UCL violations do not "not
17   merely [impact] the interests of business competitors, but of the general public as
18   well").  The entire theory of Plaintiffs' case is based on their private relationship—
19   be it contractual or quasi-contractual—with Defendants.  (*See generally id.*)
20   California law is clear that such a relationship does not give rise to a UCL claim.  *S.*
21   *Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 887 (1999)
22   ("[T]he 'unfairness' prong of section 17200 'does not give the courts a general

23   ───────────────

24   [19] To the extent Plaintiffs claim that they gave up other business opportunities in
25   reliance upon these alleged misrepresentations, the claimed damage is identical to
     that Plaintiffs allegedly suffered through breach of contract.  (*See* Cmpl. at ¶¶ 94,
26   110.)  This provides an independent basis for dismissing Plaintiffs' claims.  *See*
27   *Globex*, 2011 WL 663337, at *2 ("In California, a breach of contract may give rise
     to a claim for fraud only where . . . [there is] harm above and beyond a broken
28   contractual promise." (internal quotation marks and citations omitted)).

-34-

1  license to review the fairness of contracts.'" (internal modifications and citation

2  omitted)).  Not a single factual allegation involves public matters, and, as such, the

3  conduct alleged cannot provide the basis for a UCL claim.  *See id.* at 883-84 & n.19

4  (courts distinguish actions brought to vindicate the rights of individual consumers

5  from actions that involve the public).

6    Second, Plaintiffs cannot identify any unlawful conduct by Defendants.  At

7  most, Plaintiffs have alleged—but cannot prove—conduct amounting to a violation

8  of common law, which is insufficient to trigger UCL liability.  *See Shroyer v. New*

9  *Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1043-44 (9th Cir. 2010) ("[A]

10  common law violation such as breach of contract is insufficient.").  Moreover, as

11  discussed above, Plaintiffs cannot prove any underlying violation of common law,

12  and so cannot prove any violation of the UCL.  *See Express, LLC v. Fetish Grp.,*

13  *Inc.*, 464 F. Supp. 2d 965, 979 (C.D. Cal. 2006) (granting summary judgment as to

14  "unlawful conduct" where no predicate common-law violations existed).[20]

15    Third, Plaintiffs' breach of joint venture/partnership agreement and breach of

16  contract claims provide an adequate remedy at law.  Plaintiffs cannot maintain a

17  claim for equitable relief under the UCL when damages are available.  *See*

18  *Prudential Home Mortg. Co. v. Superior Court (Centerbank Mortg. Co.)*, 66 Cal.

19  App. 4th 1236, 1249-50 (1998); *see also* 5-H William L. Stern, *Bus & Prof. Code.*

20  *§ 17200 Practice* § 5:239 (The Rutter Group 2004).

21  **VIII. CONCLUSION**

22    For the foregoing reasons, Defendants respectfully request that the Court

23  grant their Motion for Summary Judgment and enter judgment against Plaintiffs on

24  each and every claim for relief.

---

25  [20] To the extent Plaintiffs suggest Defendants' conduct was fraudulent, summary

26  judgment remains appropriate because Plaintiffs cannot identify any conduct where

27  the "the public [is] likely to be deceived."  *Belton v. Comcast Cable Holdings, LLC*,
151 Cal. App. 4th 1224, 1235-36, 1241 (2007); *see Express, LLC*, 464 F. Supp. 2d

28  at 980 (granting summary judgment because conduct was never directed to public).

1

2   DATED:  April 7, 2015                WILLIAM F. SULLIVAN
3                                        HOWARD M. PRIVETTE
                                         D. SCOTT CARLTON
4                                        SARAH KELLY-KILGORE
                                         PAUL HASTINGS LLP
5

6                                        By: _William F. Sullivan_____
7                                              WILLIAM F. SULLIVAN

8                                        Attorneys for Defendants
                                         SFX ENTERTAINMENT, INC. and ROBERT
9                                        F.X. SILLERMAN

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-36-